***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Glenn with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties agreed that the depositions of lay witnesses could be taken post-hearing and that no live testimony would be presented at an evidentiary hearing. The parties agreed, with the consent of Deputy Commissioner Glenn, to waive hearing before the Commission and to subsequently submit transcripts of lay and expert witnesses. The parties were also authorized to submit stipulated and other exhibits to the Commission.
2. Plaintiffs and defendants HBD Industries, Inc. and its carriers, Liberty Mutual Insurance Co., Specialty Risk Services (The Hartford), and Cigna/ACE/ESIS are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. Defendants H. K. Porter Company and its carriers, Continental Insurance Company and Cigna/ACE USA, acknowledge that they were added as parties by order filed by former Deputy Commissioner Morgan S. Chapman on September 4, 2003, but they deny that the Industrial Commission has jurisdiction over them on the basis that plaintiffs did not file a timely *Page 3 
claim against them and on the further basis that deceased employee, J. C. Taylor, never worked for H. K. Porter Company.
4. Deceased employee (hereinafter "decedent") was employed at the same facility in Salisbury, North Carolina, from February 6, 1984 until June 30, 1995. Decedent was employed by BF Goodrich Co. from February 6, 1984 until approximately December 2, 1986. From approximately December 2, 1986 until approximately June 30, 1988, there is a dispute among the parties as to whether H. K. Porter Company or HBD Industries was the employer of decedent. Decedent was employed by HBD Industries from at least June 30, 1988 until June 30, 1995, when he retired.
5. Coverage for defendant-employers includes the following:
 a. Continental Insurance Company for H.K. Porter Company — May 1, 1986 to April 30, 1987.
 b. Insurance Company of North America/CIGNA/ACE USA for H.K. Porter Company — May 1, 1987 to April 30, 1988.
 c. Cigna/ACE/ESIS for HBD Industries, Inc. — May 1, 1988 to May 1, 1990.
 d. Specialty Risk Services (The Hartford) for HBD Industries, Inc. — May 1, 1993 to May 1, 1994.
 e. Liberty Mutual Insurance Company for HBD Industries — May 1, 1990 to May 1, 1992; May 1, 1994 to July 1, 1994; and May 1, 1995 to May 1, 1996.
6. Decedent died on January 11, 1999. On January 27, 1999, Sylvia R. Taylor qualified as the executrix of her late husband's estate. Sylvia R. Taylor died on October 30, 2000. After her death, decedent's sisters, Jean Taylor Greene and Belinda Taylor Harrison, were *Page 4 
qualified as co-administrators C.T.A. of decedent's estate on January 9, 2001. Mrs. Greene died on October 22, 2004.
7. Phillip Lee Snipes qualified as the executor of Sylvia R. Taylor's estate on January 5, 2001. A purported final accounting was filed in the estate on September 24, 2001. Mr. Snipes was later removed as executor for failure to file accountings and for failure to fulfill his fiduciary duties. On November 13, 2006, Letters were issued to John T. Hudson as Administrator C.T.A. for the Estate of Sylvia R. Taylor.
8. The parties agree that Sylvia Taylor was the sole dependent of decedent at the time of his death.
9. The following documents are introduced as stipulated exhibits:
 a. 01/27/99 Letters Testamentary to Sylvia R. Taylor.
 b. 01/09/01 Letters of Administration to Jean Taylor Greene and Belinda Taylor Garrison
 c. Certificate of Death for Jean Taylor Greene
 d. 11/13/06 Letters of Administration to John T. Hudson
 e. Letter from Mr. Hudson dated 03/05/07
 f. Certificate of Death of J. C. Taylor
 g. Two Form 18Bs for lung cancer and asbestosis, dated 12/10/99
 h. Form 61 denials filed on behalf of HBD Industries and Liberty Mutual, dated 06/15/00
 i. Form 33, dated 06/17/02
 j. Form 33R filed on behalf of HBD Industries and The Hartford, dated 06/20/02 *Page 5 
 k. Form 33R filed on behalf of HBD Industries and Liberty Mutual Insurance Company, dated 07/08/02
 l. Plaintiff's 08/28/03 Motion to Add H. K. Porter Company, Cigna/ACE USA and Continental Insurance Company as parties
 m. Deputy Commissioner Morgan S. Chapman's 09/04/03 Order adding carriers for H. K. Porter Company
 n. Form 61 filed on behalf of H. K. Porter Co. and Continental Insurance Company, dated 04/28/04
 o. Form 33R filed on behalf of H. K. Porter Co. and Continental Insurance Company, dated 04/28/04
 p. 05/12/04 Order from Deputy Commissioner Morgan Chapman
 q. Form 33 filed by HBD Industries and Liberty Mutual, dated 06/12/06
 r. Form 33R filed by H. K. Porter Company and Continental Insurance Company, dated 06/28/06
 s. Form 33R filed by H. K. Porter Company and ACE USA/ESIS, dated 07/25/06
 t. Order filed by Deputy Commissioner George T. Glenn, II on October 27, 2006
 u. Order filed by Deputy Commissioner George T. Glenn, II on May 11, 2006
 v. Transcript of hearing before Deputy Commissioner Morgan S. Chapman on October 15, 2002 *Page 6 
 w. Pre-trial Agreement dated October 15, 2002, together with documents stipulated in accordance with said pre-trial agreement
 x. Transcript of deposition of Dr. John E. Craighead taken on January 27, 2003
 y. Transcript of deposition of Dr. Frederick Mast Dula, Jr. taken on February 7, 2003
 z. Transcript of deposition of Linwood Miller, Jr. taken on April 15, 2003
 aa. Transcript of deposition of Edward Donnell Gibson taken on April 15, 2003
 bb. Social Security Earnings Statement for J. C. Taylor
 cc. 10/20/97 report from Dr. Rostand
 dd. Report of Dr. Arthur L. Frank
 ee. Report of Dr. Steven H. Dikman
 ff. Report of Dr. Ronald E. Gordon
 gg. Medical records of Rowan Diagnostic Clinic/Dr. Frederick U. Goss
 hh. Medical records of Lexington Oncology Clinic/Dr. Robert W. Tucker
 ii. Any and all medical records showing treatment of decedent at Rowan Regional Medical Center
 jj. Any and all medical records showing treatment of decedent at Lexington Memorial Hospital
 kk. Any and all medical records showing treatment of decedent at Lexington Oncology Clinic *Page 7 
 ll. Any and all medical records showing treatment of decedent at Wake Forest University Physicians
 mm. Itemized medical expenses
 nn. Plaintiff's Social Security Earnings Statement
 oo. Plaintiff's personnel file from HBD Industries, Inc.
 pp. Plaintiff's 02/01/01 Answers to HBD Industries, Inc. and Liberty Mutual's First Set of Interrogatories and Request for Production of Documents
 qq. Plaintiff's 03/16/04 discovery responses to H.K. Porter Company and ACE USA
 rr. 08/15/02 report from Dr. John E. Craighead
 ss. 09/13/02 supplemental report from Dr. Craighead
 tt. 06/27/02 radiological review of Dr. Philip C. Goodman
 uu. Defendants HBD Industries, INC and Specialty Risk Services' Answers to Plaintiff's First Set of Interrogatories.
 vv. Radiology reports by Dr. James Johnson, dated May 13, 1998 and September 16, 1998
 xx. Report by Dr. Rostand dated October 20, 1997
 yy. October 18, 1999 letter from Dr. Steve Dikman to William M. Graham, Esq.
 zz. February 24, 1998 report of Dr. Robert Chin
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following: *Page 8 
 FINDINGS OF FACT
1. All parties are properly before the North Carolina Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter of this case. All the parties are bound by and subject to the North Carolina Workers' Compensation Act. All parties have been correctly designated and there is no question as to the misjoinder or nonjoinder of any party.
2. During the period of decedent's employment at the Salisbury facility, the facility was owned, and decedent was employed, by various entities. From February 1984 to December 1986 he was employed by B.F. Goodrich. In approximately December 1986 the facility was purchased by H.K. Porter. In June 1988 the facility was taken over by HBD Industries.
3. Based upon the testimony offered by the witnesses and the documents produced as part of the record in this case, including decedent's personnel file, plaintiff was hired by H.K. Porter at some point in December 1986. Decedent continued in his employment with H.K. Porter until he became an employee of HBD Industries in mid-1988.
4. During the relevant time periods, H.K. Porter and HBD Industries employed three or more employees at the Salisbury facility and it and its employees were bound by and subject to the North Carolina Workers' Compensation Act.
5. The Salisbury facility where decedent worked consists of several buildings, with various portions constructed between 1917 and 1975. Around 1986 the facility underwent a major redesign and a new building was constructed to house the Fitting and Testing Department. The new facility constructed in 1986 is referred to as the "new" building and the older structure is referred to as the "old" building.
6. Decedent was initially employed in the Mill Room in the old building of the Salisbury facility. On or around September 28, 1987, decedent accepted a new job from his then employer H.K. Porter in the Fitting and Testing Department in the new building. *Page 9 
7. The new building was insulated with fiberglass insulation and was not insulated with any asbestos-containing materials.
8. Discovery responses submitted by Co-Executrixes of the Estate of J.C. Taylor in 2001 indicate that they "do not have any knowledge as to the types of asbestos-containing materials to which decedent was exposed," and further that they "have no knowledge of the specifics of the equipment, jobsites, activities or supervisors pertaining to decedent's employment."
9. Discovery responses submitted in March 2004 by the Co-Executrixes of the Estate of J.C. Taylor to H.K. Porter and ACE USA respond to an interrogatory seeking evidence of exposure to asbestos on the part of decedent by referring defendants to the depositions of Linwood Miller and Edward Gibson, and the Industrial Hygiene Report for HBD Industries. The discovery responses further indicate that "decedent was last exposed to asbestos while working in the `old' building."
10. The US Healthworks Industrial Hygiene Report, included as part of the evidence in this case, surveyed the old building for asbestos and concluded that, "based on the concentrations measured on December 13, 2000, there does not appear to be an airborne asbestos fiber hazard in the areas monitored." The new building was not discussed in the report.
11. Plaintiffs did not submit any documents which show any exposure to asbestos on the part of decedent during his employment at the Salisbury facility. *Page 10 
12. The new building housed the Fitting and Testing Department, otherwise known as Department 8109. Decedent began working in the new building in October 1987. Decedent remained in the Fitting and Testing Department in the new building until his retirement in 1995.
13. Grady Lucas, a co-worker, testified that decedent worked in the Mill Room in the old building. He further testified that there were pipes running all through the Mill Room. However, Mr. Lucas provided no testimony regarding the type of insulation, if any, that covered these pipes. Mr. Lucas further testified that once decedent transferred to the new building, decedent would be required to go into the old building on a daily basis to gather supplies and build boxes as part of his duties in the fitting and testing department. Mr. Lucas provided no competent testimony tending to show that decedent was exposed to asbestos while working in either the old or new building.
14. Edward Gibson, another co-worker, testified that when decedent was working with vulcanizers in the old building, decedent would have been within 10 to 15 feet of steam pipes, though he would not have been working closely with these pipes. Mr. Gibson had no recollection as to whether these steam pipes were insulated. Mr. Gibson did not know what type of duties decedent performed while working in the Fitting and Testing Department.
15. Linwood Miller, an employee that worked in the Engineering and Maintenance Departments at the facility, could not specifically remember decedent as a co-worker. Mr. Miller testified that he believed the steam pipes in the old building were insulated with asbestos because the insulation looked like asbestos and he saw boxes of insulation that had the word asbestos written on them.
16. James Smyre was decedent's direct supervisor for the duration of decedent's employment in the Fitting and Testing Department and has personal knowledge of the duties *Page 11 
performed by decedent in the Fitting and Testing Department. Based on the testimony of Mr. Smyre, decedent was responsible for fitting test caps onto hoses and conducting hydrostatic and RMA testing according to a given customer's specifications. The fitting materials were kept in the new building and the work was performed inside the new building.
17. The undersigned find that Mr. Smyre has better and more accurate knowledge of the duties and requirements of the position worked by decedent in the Fitting and Testing Department. As such, his testimony concerning what duties were performed by decedent and where they were performed after October 1987 is afforded greater weight than the testimony of Mr. Lucas, Mr. Gibson and Mr. Miller.
18. Decedent was also responsible for assembling wooden crates for shipping customer orders. The crates were assembled in the carpenter shop. The carpenter shop was a separate structure, with four separate walls that were not shared with the old building. The carpenter shop was located between the old and new buildings. The old building could not be directly accessed from the carpenter shop.
19. Occasionally, decedent would return to the old building to pick up a pallet of hose. This would only have been done on occasions where decedent was filling in for someone on vacation, roughly 10-15 times a year. Decedent was not the only person in his department who would be asked to fill-in on these occasions and because of the volume of work in his department, Mr. Smyre would have asked decedent to pick up pallets of hose from the old building as a last resort.
20. On the occasions that decedent would have to go to the old building to pick up hose, he would drive a forklift across the parking lot to the old building and then use the forklift *Page 12 
to pick up the pallet and return to the new building. Decedent would travel 40-60 feet into the old building to collect the hose. The trip would take five minutes.
21. There is no competent evidence that plaintiff was exposed to asbestos during the course of his employment in either the old or new building.
22. Prior to his diagnosis of lung cancer, decedent had been treated for chronic rhinitis, bronchitis, indigestion, ulcers, and severe erosive esophagitis. He also had a 2-3 pack per day smoking habit and chronic obstructive pulmonary disease.
23. A chest x-ray taken June 14, 1989, as part of treatment to monitor decedent's several incidences of chest pain, noted calcifications in the lower left lung and an ill-defined density present in the upper left lung. A chest x-ray taken during decedent's March 1995 hospitalization for acute respiratory infection and COPD causing hypoxemia showed increased interstitial markings and a left lower lobe granuloma.
24. On July 29, 1996, decedent presented to Dr. Goss complaining of rectal bleeding, and was referred for a flexible sigmoidoscopy. This was subsequently found to be small cell lung cancer.
25. On December 23, 1997, decedent was diagnosed with small cell lung cancer with mediastinal involvement, which was treated with chemotherapy. Chest x-rays and CT scans taken in 1988 to monitor this cancer noted a progression to the liver and rectum.
26. Decedent died on January 11, 1999. The listed causes of death were respiratory failure, metastatic brain lesions, lung cancer and invasive rectal adenocarcinoma.
27. Dr. Frederick Dula, Jr., a board certified diagnostic radiologist and NIOSH certified B reader, reviewed decedent's chest x-ray of August 22, 1997. Dr. Dula opined that plaintiff's x-ray showed interstitial and plural changes consistent with asbestosis. However, he *Page 13 
further opined that a definitive diagnosis of asbestosis is best obtained through an examination of the lung tissue by a pathologist.
28. Dr. Philip Goodman reviewed decedent's chest x-ray of December 26, 1997, and compared it with the August 22, 1997, chest x-ray. In Dr. Goodman's opinion, the films showed a possible small pneumothorax and subcutaneous emphysema possibly caused by a biopsy of the left lung mass, emphysema, and probable old tuberculosis or histoplasmosis. Dr. Goodman found no evidence of asbestos related pleural plaques or asbestosis and noted the pleural space to be normal.
29. Decedent's lung biopsies, CT scans and chest x-rays were sent to Dr. Steven H. Dikman at the Mt. Sinai Medical Center for review. On October 18, 1999, Dr. Dikman found a low number of asbestos fibers present in decedent's lung tissue. Nevertheless, he opined in his report that decedent's occupational exposure to asbestos, along with his smoking history, led to his development of lung cancer.
30. Dr. John Craighead conducted an evaluation of the medical records and pathological material from decedent in 2002. Dr. Craighead reviewed the decedent's medical history, including his 1997 small cell carcinoma of the lung diagnosis. He also noted the limited autopsy and review performed by Dr. Dikman. Based upon his review of the records available to him, Dr. Craighead concluded that the concentrations of asbestos in the lung tissue of decedent suggested a very limited exposure to asbestos. He also concluded that the exposure would have been insufficient to cause the disease process asbestosis. In Dr. Craighead's opinion decedent's lung cancer was the result of chronic cigarette smoking.
31. Subsequent to his initial report, Dr. Craighead had an opportunity to review decedent's tissue. Dr. Craighead confirmed anaplastic small cell carcinoma of bronchial origin *Page 14 
and severe emphysematous disease. However, he found no asbestos bodies and stated: "Accordingly, there is no evidence whatsoever of the disease process asbestosis. . . . In the absence of asbestosis, it is my opinion with a high degree of medical certainty that the cancer was caused by cigarette smoking. Asbestos played no causative or contributory role in its development or progression." Dr. Craighead confirmed his findings and conclusions previously outlined in his reports in his deposition of January 27, 2003.
32. Dr. Arthur Frank reviewed plaintiff's medical records, including the radiology reports from plaintiff's x-rays and CT scans and the pathology reports. Dr. Frank opined to a reasonable degree of medical certainty that plaintiff's lung cancer and rectal adenocarcinoma were related to plaintiff's exposure to asbestos. Dr. Frank further indicated that his opinion would change if facts showed that plaintiff did not have occupational exposure to asbestos.
33. The Full Commission gives greater weight to the opinions and conclusions of Drs. Goodman and Craighead.
34. Based on the competent testimony and evidence of record, the Full Commission finds as fact that decedent was not injuriously exposed to asbestos in his employment with defendants. It is further found that decedent did not develop asbestosis or any asbestos-related disease or cancers as a result of occupational exposure to asbestos.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In order to establish an occupational disease under N.C. Gen. Stat. § 97-53(13), a claimant must show that the employment exposed him to a greater risk of contracting the disease *Page 15 
than the public generally. Rutledge v. Tultex Corp., 308 N.C. 85,301 S.E.2d 359 (1983). In addition, the claimant must show that the employment significantly contributed to, or was a significant causal factor in, the development of the disease. Hardin v. Motor Panels,Inc., 136 N.C. App. 351, 524 S.E.2d 368, disc. rev. denied,351 N.C. 473,543 S.E.2d 488 (2000). Where the condition was aggravated but not originally caused by the claimant's employment, a claimant must show that the employment placed him at a greater risk for contracting or developing the condition. Futrell v. Resinall Corp., 151 N.C.App. 456,566 S.E.2d 181 (2002), aff'd per curiam, 357 N.C. 158, 579 S.E.2d 269
(2003); Norris v. Drexel Heritage Furnishings, Inc., 139 N.C.App. 620,534 S.E.2d 259 (2000), cert. denied, 353 N.C. 378, 547 S.E.2d 15 (2001). In the present case, plaintiffs failed to prove by the greater weight of the evidence that decedent's employment caused or was a significant contributing factor in the development of decedent's lung cancer or that decedent was at an increased risk of developing this condition due to his work.
2. Plaintiffs have failed to show that decedent was injuriously exposed to the hazards of asbestos and that decedent contracted asbestosis or an asbestos-related disease. N.C. Gen. Stat. §§ 97-53(24) and 97-62.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiffs' claim for benefits is hereby denied
2. Each side shall bear its own costs.
 This the 2nd day of July, 2008. *Page 16 
S/____________________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/____________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/____________________________ DANNY LEE MCDONALD COMMISSIONER *Page 1